UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SANDRA COLEMAN,                    )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )          Case No. 4:11CV2131 CDP
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
          Defendant.               )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Sandra Coleman's application for supplemental

security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et*

*seq*. Coleman claims she is disabled, listing her conditions as "epilepsy, psychological,

and borderline personality." The Administrative Law Judge concluded, however, that

Coleman is not disabled, and Coleman now appeals that decision. Because I find the

decision denying benefits was not supported by substantial evidence, I will reverse the

decision of the Commissioner and remand for further consideration.

## Procedural History

On January 8, 2009, Sandra Coleman filed for supplemental security income

payments alleging disability beginning in 1998. The Social Security Administration

denied Coleman's application at the initial level. Missouri is one of several states

participating in modifications to the disability determination procedures, which include the elimination of the reconsideration step in the administrative appeals process. 20 C.F.R. § 416.1406, 416.1466 (2011). Coleman's appeal in this case therefore proceeded directly from this initial denial to the administrative law judge level. Coleman appeared and testified at a hearing on July 21, 2010.[1] The ALJ issued an opinion on September 21, 2010 upholding the denial of benefits. Coleman filed a request for review with the Appeals Council on October 8, 2010. The Appeals Council denied Coleman's request for review on November 18, 2011. Accordingly, the ALJ's determination stands as the Commissioner's final determination. Coleman filed this request for review on December 8, 2011.

## Testimony Before the ALJ

At the time of the administrative hearing, Coleman was forty-eight years old and lived with her fiancé. They lived in a single level apartment, but were about to move to a two-story apartment. Coleman was a high school graduate and testified that she had been held back one year, possibly between the second and third grades. Coleman stated that she was primarily in special education classes in school. After high school she had also participated in vocational rehabilitation.

Coleman testified that she suffered from epilepsy. She stated that when she had an

---

[1] Coleman appeared for a hearing on February 11, 2010, but was not represented at that time. No testimony was taken during the February 11, 2010 proceedings, and the hearing was delayed so that Coleman could procure representation.

epileptic event, she was generally unaware of it but it was observable by other people. She also testified that she did not lose consciousness during seizures, and she could sometimes see her legs and arms twitch. She stated that her neck would sometimes "tweak" as if someone was grabbing and shaking her. Coleman testified that she had experienced a seizure earlier that month, which she felt and her fiancé observed. She had tried Dilantin to control her seizures, but had stopped because it caused an allergic reaction. Coleman testified that she was currently taking Phenobarbital twice daily, as prescribed.

In addition to her epilepsy, Coleman testified about various mental health issues. She stated that she was "a borderline personality," and that she was presently seeing Dr. Nawaz for depression. Coleman recalled her depression beginning around the time her son passed away, in 1988. Coleman had been seeing Dr. Nawaz since May of 2010. She testified that she began seeing Dr. Nawaz at the urging of both her fiancé and her attorney, and visited her every month or so for about 5 to 10 minutes each visit. Coleman stated that Dr. Nawaz prescribed Lexapro, which helped her "calm her brain down." The Lexapro also helped control Coleman's crying spells. She testified that since beginning the Lexapro, she sometimes felt like not doing anything, and would have trouble controlling her anger.

Coleman also testified about various physical ailments, including problems with her eyes, wrists, knees, and back. She stated that she was nearsighted and had an

astigmatism, making it difficult to see at night. She wore glasses, which helped with her nearsightedness. Coleman also testified that she had tendinitis in her wrists, making it difficult to pick anything up. She stated that she could not pick up her granddaughter who weighed around forty pounds, and struggled to lift anything of five pounds or less. Coleman claimed that her knees were "shot," and that she could walk for about an hour before she felt discomfort. She also stated that her back bothered her, and she could only stand for ten or fifteen minutes without a problem. Coleman testified to having a heart murmur which sometimes felt like someone beating her chest. She stated that she was not taking medication for her heart, nor had she gone to the hospital the last time she experienced a heart event.

Coleman did not work at the time of the hearing. Her most recent job was as a woodmill operator. Coleman did not know what products were handled at the mill. Her duties consisted of pulling wood through the mill, stacking it, sweeping floors, and other similar activities. Coleman testified that she stopped working at the mill because of her heart pain. Prior to the woodmill, she worked doing laundry in a nursing home. Coleman stated that both jobs were obtained through vocational rehabilitation programs in Oregon.

Coleman testified that at various times she lived with her parents, in housing, with friends, or with boyfriends. In total, she believed she lived about four or five years on her own. Coleman stated that she currently lived with her fiancé, who was legally blind and

diabetic.  She testified that her fiancé handled their finances and cooked, and she did the laundry, dishes, and kept the house clean.  They went grocery shopping together. Coleman stated she had a driver's license and that she was capable of using money and knew what the different bills and coins were worth.  Regarding her normal day, she stated that she spent her time sitting at home and watching television.  Coleman stated that although she had many friends in the past, she currently had none and did not go out often.  She also testified that she liked to read mystery books, but had difficulty concentrating if there were any distractions such as television.

The ALJ called a vocational expert, Brenda Young, who had been provided with and reviewed Coleman's file, including her past work history.  The ALJ described a hypothetical individual for Young of Coleman's age, education, and work experience; who was limited to the full range of medium work except her posturals were at occasional; who needed to avoid all exposure to operational control of moving machinery and unprotected heights, and all exposure to hazardous machinery; who was limited to a job that was simple, routine, and repetitive in a low-stress environment; who was limited to a job with only occasional decision making or occasional changes in the work setting; and who was limited to a job that had only occasional interaction with the public and co-workers.  The ALJ then asked Young whether this hypothetical person could perform any jobs in the regional or national economy.  Young replied that such an individual could work as a hand packer or packager or in a janitorial job.

The ALJ then asked about a hypothetical individual with the same characteristics, except this person's exertional limits went from medium to light, who must avoid all exposure to operational control of moving machinery and unprotected heights and all exposure to hazardous machinery. Young replied that this individual could perform housekeeping jobs, some light assembly jobs, and dining room jobs such as cafeteria helpers. The ALJ then asked Young whether any jobs existed for either hypothetical individual with the added condition that she would miss work three or more days a month because of mental health restrictions. Young replied that this would eliminate all jobs for either individual.

Finally, Coleman's attorney described a hypothetical individual of Coleman's age, education, and work experience, who was limited to the most simple one-step directions. Young testified that such an individual could not perform any of the jobs she had listed, or any other jobs.

**Medical Records**

Coleman's high school records indicate that she was enrolled in special education classes. On April 9, 1980, Coleman took the Wechsler Adult Intelligence Scale (WAIS) IQ test. She was eighteen years old at the time, and the test revealed a verbal IQ of 87, a performance IQ of 97, and a full scale IQ of 91.

On August 17, 2006, Paul W. Rexroat, Ph.D., conducted a psychological

examination of Coleman.  Dr. Rexroat felt that Coleman was attempting to malinger but was afraid to do so, and he considered her "somewhat reliable."  Dr. Rexroat noted that Coleman's dress, emotional responsiveness, affect, energy level, alertness, gait, and posture were all normal.  He also noted that her speech was coherent, with no abnormalities that would indicate a thought disorder.  Coleman reported to Dr. Rexroat that she had occasional mood swings.  Dr. Rexroat also noted that Coleman was well-oriented and could perform addition, subtraction, and multiplication.  Dr. Rexroat's notes evidence that Coleman responded appropriately to tests of verbal judgment and verbal reasoning.  She had difficulty naming the current president, large cities in the United States, and could not perform division.  Dr. Rexroat estimated an IQ in the borderline range.

Regarding Coleman's limitations, Dr. Rexroat concluded that she was able to understand and remember simple instructions, could sustain concentration and persistence with simple tasks, and could interact socially and adapt to her environment. He noted that there were few limitations in daily living activities, social functioning, and ability to manage her own funds.  He also noted that her memory functioning appeared to be in the borderline range.  He assigned her a GAF of 75.

Dave A. Rengachary, M.D., reported on May 22, 2006 that Coleman presented with episodes concerning for seizures, but was unable to undergo further testing because she lacked insurance.  Dr. Rengachary prescribed Dilantin for the seizures.  He also noted

that a cardiovascular examination revealed a regular rate and rhythm, that Coleman was alert and oriented, and that motor sensory, coordination, and reflexes were normal. Dr. Rengachary noted a slight cognitive delay with Coleman's verbal responses.

Coleman visited Dan Frissell, M.D., on January 4, 2008, with back and shoulder pain, and for follow up on a skin lesion on her nose that had previously been treated with freezing. Dr. Frissell noted that she had lower back pain, poor dental health, and was anxious. Coleman's heart, respiratory effort, and lung auscultation were all normal. Dr. Frissell retreated Coleman's nose lesion with freezing.

Coleman returned to Dr. Frissell on January 18, 2008 complaining of pain in her hips, shoulders, and right ankle. Dr. Frissell noted that Coleman's teeth were in poor repair, she had tenderness in her upper right extremity, she had diminished lung auscultation, and was anxious. He noted that her right ankle was not swollen or red, despite having previously been broken. Coleman was also negative for chest pain, abdominal pain, and joint pain.

On February 7, 2008, Coleman had x-rays taken of her right ankle, lumbar spine, and right shoulder. Her right ankle x-ray was normal, with no sign of fracture, osseous erosion, or right ankle joint effusion. The lumbar spine x-ray revealed bilateral lumbarization of the S1 segment. There was also slight decrease in diskal height at L5-S1, but the report noted that this could be normal variation. The right shoulder x-ray showed that the right acromiohumeral distance was mildly narrowed, but there was no

fracture, joint separation, or glenohumeral dislocation.

Lauretta V. Walker, Ph.D., conducted a psychological examination of Coleman on February 18, 2009. Dr. Walker diagnosed Coleman with anxiety disorder NOS, probable mild mental retardation, epilepsy, asthma, and a GAF of 58. She noted that Coleman's speech was understandable, but she had difficulty expressing herself at times. Dr. Walker noted that Coleman did not know the date, year, or day of the week, or who the current president was. Dr. Walker opined that Coleman was mentally retarded, and found it hard to understand how her IQ scores from 1980 were possible. Dr. Walker did not see any borderline personality symptoms. She noted that Coleman functioned at a low level, would have a difficult time being able to understand and follow any but the most simple one step directions, and had problems concentrating, focusing, and attending.

Coleman returned to Dr. Rengachary on February 23, 2009, over two years after her previous visit. At that time Dr. Rengachary noted that there had been no generalized events on her Phenobarbital, although she reported some occasional myoclonic jerks, as well as a rash associated with her Dilantin. Coleman visited Dr. Rengachary once more, in August 2009.

On August 26, 2009, Coleman had an MRI at the St. Genevieve County Memorial Hospital. Kenneth Miller, M.D., noted that the exam showed diffuse multilevel degenerative disc disease without significant gross cord impingement or definite neuroforaminal stenosis.

Coleman visited Nirmal Antonio, MD, on February 18, 2010 to establish care. Dr. Antonio noted that she had no heart murmur. He continued her Phenobarbital prescription, and noted an iron deficiency. Coleman returned to Dr. Antonio on March 12, 2010 complaining of knee, back, and neck pain. Dr. Antonio noted that Coleman's vitals were stable and there was no heart murmur. He noted paraspinal spasm in the cervical region and tenderness in the neck, as well as paraspinal spasm in her back. Dr. Antonio also noted tenderness in the knee, which he thought to be arthritis. He ordered various X-rays and prescribed muscle relaxants.

On March 23, 2010, Coleman had x-rays of her cervical spine, lumbar spine, and knees. The cervical spine series showed no acute osseous abnormalities, nominal retrolisthesis of C3 and C4 with loss of the normal lordotic curvature of the cervical spine, and degenerative changes with loss of the intervertebral disc space seen at C4-5, C5-6, C6-7, and C3-4. The lumbar spine series showed no acute osseous abnormality and no significant interval change. X-rays of her left knee showed some minimal loss of the joint space in the medial compartment, but no acute osseous abnormalities. X-rays of her right knee showed no joint effusion and no acute osseous abnormalities.

On April 9, 2010, Coleman underwent psychiatric intake with counselors for Shajitha Nawaz, M.D. Coleman reported depression, daily crying episodes, and anger management problems. The counselors noted that Coleman had normal speech, was alert and calm, and had appropriate affect and logical thought processes. They reported that

her judgment was limited due to potential borderline intellectual functioning, and that she likely had below average intelligence.

On May 12, 2010, Coleman saw Dr. Frissell complaining of hot flashes, chest pain, and acid reflux pain. Dr. Frissell noted that Coleman complained of anxiety. Dr. Frissell showed Coleman her ECG, which was normal, and discussed her need to lose weight and to see a dentist for dental care.

On May 26, 2010, Dr. Nawaz conducted a psychiatric evaluation of Coleman. Coleman reported to Dr. Nawaz that she got angry easily, felt down at times, and had difficulty sleeping. Dr. Nawaz diagnosed Coleman with mood disorder NOS, borderline personality disorder, seizure disorder, and overweight. Dr. Nawaz noted that Coleman had a GAF of 60, and that her borderline personality disorder was her "main" issue. Dr. Nawaz prescribed Lexapro and recommended psychotherapy.

After the evaluation, Dr. Nawaz completed a questionnaire at the request of Coleman's attorney. Dr. Nawaz reported the diagnoses of mood disorder NOS, borderline personality disorder, seizures, and past substance abuse. Dr. Nawaz noted that Coleman's disorders manifested in relationship problems, mood swings, poor self-esteem, difficulty controlling anger, and impulse control problems. Regarding the abilities needed to do unskilled work, Dr. Nawaz marked Coleman as "limited but satisfactory" in most categories. Dr. Nawaz marked Coleman as "seriously limited but not precluded" in the following categories: working in coordination with or proximity to

others without being unduly distracted, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, dealing with stress of semiskilled and skilled work, and maintaining socially appropriate behavior.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 200) (citation omitted).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the education, background, work history, and age of the claimant;

(3)     the medical evidence from treating and consulting physicians;

(4)     the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5)     any corroboration by third parties of the plaintiff's impairments; and

(6)     the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(l); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) and 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.

If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. §§ 404.1520 and 416.920.

When evaluating evidence of subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Hecler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1.      the claimant's daily activities;

2.      the duration, frequency, and intensity of the pain;

3.      precipitating and aggravating factors;

4.      dosage, effectiveness and side effects of
        medication;

5.      functional restrictions.

*Id.* at 1322.

## **The ALJ's Findings**

The ALJ found that Coleman did not suffer from a disability within the meaning of

the Social Security Act at any time through the date of the decision.  He issued the

following specific findings:

1.      The claimant has not engaged in substantial gainful activity since January 8,
        2009, the application date (20 CFR 416.971 *eq seq.*).

2.      The claimant has the following severe impairments:  epilepsy, mood
        disorder not otherwise specified, borderline personality disorder and obesity
        (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments
        that meets or medically equals one of the listed impairments in 20 CFR Part
        404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, I find that the claimant has
        the residual functional capacity to perform medium work as defined in 20
        CFR 416.967(c) except the claimant could occasionally perform postural
        activities (i.e. climbing, crawling, kneeling, stooping, crouching, etc); must
        avoid all exposure to moving machinery, unprotected heights and hazardous
        machinery; limited to simple routine tasks in a low stress environment with
        only occasional interaction with public or coworkers.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on January 27, 1962 and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 8, 2009, the date the application was filed (20 CFR 416.920(g)).

The ALJ concluded that although Coleman had severe impairments, the medical records did not support her allegations about the severity of her limitations. The ALJ found that Coleman's treatment for epilepsy was sporadic and inconsistent, that her medications effectively controlled her symptoms, and that her testimony regarding daily activities was inconsistent with her alleged limitations. He found that there was no medical evidence to confirm whether her obesity would limit her ability to sustain activity on a regular and continuing basis. The ALJ found that Coleman would have mild limitations because of her mental impairments and deficiencies in social functioning, and moderate limitations in concentration, persistence, and pace. He found that Coleman was

not fully credible, particularly given her limited work history and the contradictions between her allegations about the severity of her symptoms as compared with her medical records and ability to perform daily activities.

## Discussion

When reviewing a denial of Social Security benefits, a court cannot reverse an ALJ's decision simply because the court may have reached a different outcome, or because substantial evidence might support a different outcome. *Jones ex rel. Morris v. Barnhard*, 315 F.3d 974, 977 (8th Cir. 2003); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court's task is a narrow one: to determine whether there is substantial evidence on the record as a whole to support the ALJ's decision. 42 U.S.C. § 405(g); *Estes v. Barnhard*, 275 F.3d 722, 724 (8th Cir. 2002). On appeal, Coleman raises three issues. She argues that the ALJ failed to fully develop the record by refusing to order a new IQ test, that the ALJ failed to properly consider all of the opinion evidence, and that the ALJ failed to properly consider all of her severe medically determinable impairments in determining her residual functional capacity. Because I find that the ALJ's decision is not supported by substantial evidence in the medical record, I will reverse and remand for further proceedings.

### The ALJ Erred in Failing to Discuss Coleman's IQ

Coleman argues that the ALJ erred in failing to grant her request to order a WAIS IQ test. An ALJ has a duty to develop the record fairly and fully. *See, e.g., Watkins v.*

*Astrue*, 414 Fed. App'x 894, 897 (8th Cir. 2011). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011). Even if the ALJ fails to properly develop the record, reversal is only warranted where such failure is unfair or prejudicial. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (citing *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995)). According to the social security regulations, the results of IQ tests tend to stabilize by the age of 16, and therefore, test results obtained after 16 are considered valid so long as they are compatible with the claimant's current behavior. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00D(10); *Winfrey v. Astrue*, No. 4:11CV231 TCM, 2012 WL 946824, at *14 (E.D. Mo. Mar. 20, 2012).

The record contains Coleman's results from a WAIS test she took at the age of eighteen. She scored a verbal IQ of 87, a performance IQ of 97, and a full scale IQ of 91. This places Coleman in the "average" range. Coleman argues that because substantial evidence in the record supports a finding that she has decreased cognitive functioning, a new WAIS test was warranted. Coleman cites her placement in special education during high school, as well as observations from various doctors regarding her cognitive abilities.

The actual record is inconsistent with regard to Coleman's cognitive abilities. Dr. Rengachary noted "slight cognitive delay" with Coleman's verbal responses. Dr. Rexroat

estimated Coleman's IQ was in the borderline range.  Although he believed that Coleman was attempting to malinger, he also noted that she was afraid to actually do so.  Dr. Nawaz's intake counselors noted that Coleman's judgment was limited "due to some potential borderline intellectual functioning," although Dr. Nawaz concluded that Coleman had average intellectual ability.  Dr. Walker believed Coleman was mentally retarded and could perform only simple, one-step tasks.  Coleman's own testimony revealed that her daily activities included caring for her blind fiancé, grocery shopping, and housework.

The ALJ discussed Coleman's mental abilities to a limited degree.  He noted Dr. Walker's conclusion of probable mild mental retardation, and her limiting Coleman to simple one-step tasks.  He also noted that Dr. Walker reported Coleman had problems concentrating, focusing, and attending.  The ALJ partially discounted Dr. Walker's conclusions to the extent he found them to be inconsistent with Coleman's own testimony regarding her daily activities.  The ALJ also noted Dr. Nawaz's evaluation of Coleman.  Dr. Nawaz found that Coleman had average intellectual ability, and "fairly ok" attention, concentration, and memory.  In a questionnaire, Dr. Nawaz notated several areas in which Coleman would be "seriously limited but not precluded:" working in coordination with or proximity to others without being unduly distracted, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, dealing with

stress of semiskilled and skilled work, and maintaining socially appropriate behavior.

The ALJ claimed to "grant the claimant the benefit of the doubt," and included some mental limitations based on the reports of both Dr. Walker and Dr. Nawaz. He limited her to working jobs that require only simple repetitive tasks and working in a low stress environment with only occasional interaction with the public and coworkers. The ALJ concluded that Coleman had mild limitations in social functioning, and moderate limitations in concentration, persistence, and pace.

However, the ALJ did not articulate his reasons for refusing to order a new IQ test. In fact, he failed to mention Coleman's IQ at all. This failure to discuss Coleman's IQ score requires a remand. *See Allen v. Astrue*, No. 4:09CV1281 HEA TCM, 2010 WL 2710494, at *14 (E.D. Mo. June 22, 2010) (citing *Scott ex. Rel. Scott*, 529 F.3d 818, 824 (8th Cir. 2008). While acknowledging some of the inconsistencies in the record, he failed to address whether the IQ score already on record were compatible with Coleman's current behavior, even though several of the providers estimated that her IQ was lower than shown by the 1980 test. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00D(10). The ALJ also failed to address whether the score on record influenced his weighing of the medical evidence, and in particular, the discounted weight he gave to Dr. Walker's assessment. Finally, he failed to discuss how the IQ score on the record impacted Coleman's RFC, and he did not include the IQ score in his hypotheticals posed to the vocational expert. The case is therefore remanded for the ALJ to address the question of

Coleman's IQ score, including, if necessary, referring her for a consultative examination and including her IQ or its concrete consequences in a hypothetical to a vocational expert. *Allen*, 2010 WL 2710494, at *15.

Coleman also argues that the ALJ failed to properly consider the opinion evidence of Dr. Walker and Dr. Nawaz. Because the ALJ will need to readdress the weighing of the evidence in light of a discussion of Coleman's IQ, including new testing if necessary, I need not address that argument in this memorandum.

<u>The ALJ Erred in Failing to Discuss or Consider Coleman's Back Pain</u>

Coleman argues that the ALJ failed to consider her back pain as a severe impairment at step two of his analysis, and accordingly, failed to consider the effects of her back pain when determining her RFC. "Step two [of the five-step] evaluation states that a claimant is not disabled if his impairments are not 'severe.'" *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citing *Simmons v. Massanari*, 264 F.3d 751, 754 (8th Cir. 2001); 20 C.F.R. § 416.920(a)(4)). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Id.* at 707. "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Id.* (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)). "It is the claimant's burden to establish that his impairment or combination of impairments are severe." *Id.* (citing *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir.

2000)). "Severity is not an onerous requirement for the claimant to meet . . . but it is also not a toothless standard." *Id.* at 708.

At step two of the analysis, the ALJ found that Coleman had the following severe impairments: epilepsy, mood disorder not otherwise specified, borderline personality disorder, and obesity. He also noted that Coleman alleged depression, but that it resulted in minimal, if any, limitation on her ability to perform work-related activities when properly treated. The ALJ did not address Coleman's alleged back pain at all in the step two analysis.

The failure of an ALJ to find an impairment to be severe at step two is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process. *Matlock ex rel. D.S. v. Astrue*, No. 4:11CV1322 FRB, 2012 WL 4109292, at *11 (E.D. Mo. Sep. 19, 2012). Although the ALJ found Coleman suffered other severe impairments and continued in the evaluation process, he never considered the effects of Coleman's back pain in combination with her severe impairments. In discussing Coleman's obesity, the ALJ noted that obesity has potential effects in causing musculoskeletal and other physical impairments. However, he determined that there was no medical evidence to "confirm whether [Coleman's] obesity would limit her ability to sustain activity on a regular and continuing basis." He did not specifically discuss Coleman's allegations of back pain, nor the medical records relevant to those allegations.

Nonetheless, he reduced the residual functional capacity to account for the cumulative effect of her obesity and lowered Coleman's RFC to the medium exertional level and limited her to performing occasional postural activities. The ALJ found that her subjective complaints did not warrant further limitations.

The ALJ generally found Coleman to have poor credibility regarding the intensity, persistence, and limiting effects of her symptoms, largely due to inconsistencies between her allegations and the treatment record and objective medical evidence. The ALJ is given deference on credibility findings if he "explicitly discredits a claimant's testimony and gives a good reason for doing so." *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)). Coleman complained of back pain both in her hearing with the ALJ, as well as at various medical appointments. There is also medical evidence on the record that could support her allegations of back pain.

At a January 18, 2008 visit to Dr. Frissell, Coleman exhibited tenderness in her upper right extremity and paraspinous muscles. At the same visit, she had negative straight leg raising, normal strength, intact sensation, and normal gait. A February 7, 2008 lumbar spine x-ray revealed bilateral lumbarization of the S1 segment, but no lumbar compression and a slight decrease in diskal height that could have been a normal variation. An MRI from August 26, 2009 showed mild diffuse posterior disc bulges and spondylotic ridging, and no significant gross cord impingement or definite

neuroforaminal stenosis. A cervical spine x-ray on March 23, 2010 revealed no acute osseous abnormalities, minimal retrolisthesis C3 on C4, and loss of the intervertebral disc space heights at C4-5, C5-6, C6-7, and C3-4.

While the ALJ discussed Coleman's credibility generally and in the context of some of her other impairments, he never discussed her claims of back pain, nor his reasons for discrediting them. Furthermore, he never mentioned the medical tests discussed above. It is therefore unclear whether the ALJ included functional limitations resulting from Coleman's back pain in her residual functional capacity. The ALJ's failure to consider Coleman's back pain and related limitations removed from his consideration whether such impairment, when considered in combination with Coleman's other medically determinable impairments, resulted in a decreased ability to perform work-related functions. *Maybearry v. Astrue*, No. 4:07CV1873 DJS, 2009 WL 102097, at *20 (E.D. Mo. Jan. 13, 2009) (citing *Pratt v. Sullivan*, 956 F.2d 830, 835-36) (8th Cir. 1992)).

In short, substantial evidence does not support the ALJ's determination of non-disability in this case because his failure to discuss the IQ score and Coleman's back pain prevents me from determining whether he gave them any consideration in finding that Plaintiff was able to sustain regular, full-time employment. Therefore, I reverse and remand pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this order. *See Buckener v. Apfel*, 213 F.3d 1006, 1010 (8th Cir. 2000) (finding that

remand under sentence four of 42 U.S.C. section 405(g) is proper when the apparent purpose of the remand was to prompt additional fact-finding and further evaluation of existing facts).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate judgment in accord with this Memorandum and Order is entered this date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 25th day of February, 2013.